UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
| _____ | Honorable Marianne O. Battani |
| In Re: INSTRUMENT PANEL CLUSTERS | |
| _____ | Honorable Mona Majzoub |
| THIS RELATES TO: | |
| ALL DEALERSHIP ACTIONS | W:12-cv-00202-MOB-MKL |
| ALL END-PAYOR ACTIONS | W:12-cv-00203-MOB-MKL |

**END-PAYOR AND AUTOMOBILE DEALER PLAINTIFFS'
MEMORANDUM IN OPPOSITION TO DEFENDANT
NIPPON SEIKI CO., LTD.; N.S. INTERNATIONAL, LTD; AND
NEW SABINA INDUSTRIES, INC.'S MOTION TO DISMISS
THE DIRECT, AUTOMOBILE DEALER AND END-PAYOR
<u>PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINTS</u>**

## <u>TABLE OF CONTENTS</u>

STATEMENT OF THE ISSUES PRESENTED ................................................................. i

CONTROLLING OR MOST APPROPRIATE AUTHORITY ...................................... ii

TABLE OF AUTHORITIES .......................................................................................... iii

I.     INTRODUCTION ................................................................................................1

       SUMMARY OF EP AND AD AMENDED COMPLAINTS ...........................2

       The Nippon Seiki Plea Agreement ................................................................3

       The Yazaki Plea Agreement ..........................................................................4

III.   ARGUMENT .....................................................................................................5

    A.     The Allegations Against the Nippon Seiki Defendants Satisfy
           *Twombly's* Plausibility Requirements......................................................5

    B.     Nippon Seiki's Plea Agreement Further Allows for the Reasonable
           Inference That the Subsidiaries Participated in the Conspiracy ...........10

       C.     The Claims Against Nippon Seiki More Than Satisfy *Twombly*..........11

III.   CONCLUSION.................................................................................................15

## STATEMENT OF THE ISSUES PRESENTED

(1)        Where, as here, a foreign parent corporation (Nippon Seiki Co. Ltd.) has pleaded guilty to participating in a criminal conspiracy to fix prices and allocate customers of Instrument Panel Clusters in the United States, is it reasonable to infer, at the pleading stage, that its United States subsidiaries were members of that conspiracy where the Amended Complaints allege: (1) a wide-ranging conspiracy to fix prices of and allocate customers of Instrument Panel Clusters sold in the United States and elsewhere; (2) that the United States subsidiaries are wholly owned and controlled by the foreign parent; (3) and that the foreign parent used the United States subsidiaries as the entities through which it accomplished its conspiratorial ends.

(2)        Whereas here: (1) Nippon Seiki Co. Ltd. pleaded guilty to conspiring to fix prices and allocate customers with other persons and entities engaged in the manufacture and sale of Instrument Panel Clusters sold to a manufacturer in the United States and elsewhere during the period from at least as early as April 2008 until at least February 2010; (2) Yazaki Corporation pled guilty to conspiring to fix prices and allocate customers with other persons engaged in the manufacture and sale of Instrument Panel Clusters sold to certain automobile manufacturers in the United States and elsewhere during the period from at least December 2002 until at least February 2010; (3) the Amended Complaints provide specific illustrative examples of how defendants' conspiracy operated for several years; and (4) the Amended Complaints allege in detail facts showing that the structure and characteristics of the Instrument Panel Clusters market renders the conspiracy more plausible; is it reasonable to infer at the pleading stage that Nippon Seiki was a participant in the conspiracy during the Class Periods.

2712612v1/013286

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

### CASES[1]

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................. passim

*Carrier Corp. v. Outokumpu Oyj*,
    673 F.3d 430 (6th Cir. 2012) ......................................... 6, 7, 8

*Chocolate Confectionary Antitrust Litigation*,
    602 F. Supp. 2d, 538 (M.D. Pa. 2009) ................................. 14

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) .................................................................. 6

*Cupp v. Alberto-Culver USA, Inc.*,
    310 F. Supp. 2d 963 (W.D. Tenn. 2004) ................................. 9

*Hinds County v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) .............................. 10, 16

*In re Air Cargo Shipping Servs. Antitrust Litigation*,
    2009 WL 3443405, at *1 (E.D.N.Y. Aug. 21, 2009) ............. 13

*In re Elec. Carbon Prods. Antitrust Litigation*.
    333 F. Supp. 2d 303 (D.N.J. 2004) ........................................ 8

*In re Flat Glass Antitrust Litigation (II)*,
    2009 WL 331361, at *13 (W.D. Pa. Feb. 11, 2009) ............. 13

*In re Graphics Processing United Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................ 16

*In re High Fructose Corn Syrup Antitrust Litigation*,
    295 F.3d 651(7th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2005) ...................... 12

*In re Optical Disk Drive Antitrust Litigation*,
    No. 10-md-2143, 2012 (WL 1366718, at *2 (N.D. Cal. Apr. 19, 2012) ............. 13

*In re Packaged Ice Antitrust Litigation*
    723 F.Supp. 2d 987 (E.D. Mich. 2010) ....................... 5, 6, 12

*In re Polypropylene Carpet Antitrust Litigation*,

---

[1] All unpublished authority is included in Plaintiffs' Joint Compendium of Unpublished Authority filed with on May 28, 2013, as an exhibit to Automobile Dealer and End-Payor Plaintiffs' Opposition to Defendants' Collective Motion to Dismiss the End Payors' Consolidated Amended Class Action Complaint and the Automobile Dealers Consolidated Class Complaint.

2712612v1/013286

78 F.R.D. 603 (N.D. Ga. 1997) .......................................................................... 12

*In re Pressure Sensitive Labelstock Antitrust Litigation,*
566 F. Supp. 2d 363 (M.D. Pa. 2008). ................................................. 6

*In re Refrigerant Compressors Antitrust Litigation,*
2012 WL 2114997, at *1 (E.D. Mich. June 11, 2012) ........................ 11

*In re Refrigerants Compressors Antitrust Litigation,*
795 F. Supp. 2d 647, 660 (E.D. Mich. 2011) ................................. 12, 13

*In re Static Random Access Memory,*
580 F. Supp. 2d 896 (N.D. Cal. 2005) ............................................... 13

*In re Title Insurance Antitrust Cases,*
702 F. Supp. 2d 840 (N.D. Ohio 2010), .......................................... 9, 10

*In re Travel Agent Commission Antitrust Litigation,*
2007 WL 3171675, at *1 (N.D. Ohio Oct. 29, 2007) .................... 10, 11

*In re Vitamins Antitrust Litigation,*
2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ............................... 13

*Jung v. Ass'n of Am. Med. Colls.,*
300 F. Supp. 2d 119 (D.D.C. 2004) ..................................................... 8

*Klehr v. A.O. Smith Corp.,*
521 U.S. 179 (1997) ......................................................................... 15

*Michigan Division-Monument Builder v. Michigan Cemetery Ass'n,*
458 F. Supp. 2d 474 (E.D. Mich. 2006) ............................................. 10

*Morton's Mkt. v. Gustafson's Dairy, Inc.,*
198 F.3d 823 (11th Cir. 1999) .......................................................... 15

*Precision, Inc. v. Kenco/Williams, Inc.,*
66 F. App'x 1 (6th Cir. 2003) ............................................................ 8

*RSM Prod. Corp. v. Petroleos De Venezuela Societa Anonima,*
338 F. Supp. 2d 1208 (D. Colo. 2004) ............................................. 10

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,*
552 F.3d 430 (6th Cir. 2008) ........................................................... 10

*U.S. v. Gravier,*
706 F.2d 174 (6th Cir. 1983) ............................................................ 14

*U.S. v. Hayter Oil Co., Inc.,*
51 F.3d 1265 (6th Cir. 1995) ........................................................... 14

2712612v1/013286

The End-Payor Plaintiffs ("EP") and Automobile Dealer Plaintiffs ("AD") (together "Plaintiffs") by and through their counsel, submit this Memorandum in Opposition to Nippon Seiki Co., Ltd. ("Nippon Seiki"); N.S. International, Ltd ("N.S. International"); and New Sabina Industries, Inc.'s ("New Sabina") (collectively "Nippon Seiki Defendants") Motion to Dismiss the End-Payor Plaintiffs' Consolidated Amended Class Action Complaint (Instrument Panel Clusters[2]) and the Automobile Dealers Consolidated Class Action Complaint (Instrument Clusters) (together "Amended Complaints").[3]

## I.    INTRODUCTION

The Nippon Seiki Defendants make two principal arguments:  First, the claims against subsidiaries N.S. International and New Sabina should be dismissed with prejudice because the allegations concerning their involvement in the admitted conspiracy are insufficient.  Second, the claims against Nippon Seiki should be limited to the specific wrongdoing that it negotiated in its guilty plea agreement with the Department of Justice.  Both these arguments fail.

First, the Amended Complaints allege that: (1) the corporate parent of N.S. International and New Sabina, Nippon Seiki, pleaded guilty to fixing prices and allocating customers with another manufacturer of Instrument Panel Clusters; (2) N.S. International and New Sabina are wholly-owned and controlled by Nippon Seiki; and (3) N.S. International and New Sabina were the entities through which Nippon Seiki marketed and sold its Instrument Panel Clusters in the United States.  EP CAC ¶¶ 71, 72, 102; AD AC ¶¶ 106-108, 156-158.  Under controlling Sixth Circuit law, nothing more is required.

---

[2]  Instrument Panel Clusters, also known as meters, are the mounted array of instruments and gauges housed in front of the driver of an automobile.  They include, for example, odometers and speedometers.

[3]  The End Payors' Amended Complaint is referred to as "EP CAC".  The Auto Dealers Amended Complaint is referred to as "AD AC".  New Sabina is not named as a defendant in the EP CAC.

In addition, the plea agreement entered into between the United States and Nippon Seiki also implicates these two subsidiaries in the price-fixing conspiracy alleged here because it requires the subsidiaries to provide cooperation to the Department of Justice in its ongoing investigation.   AD AC ¶ 157.   Presumably, these material provisions would not have been included in the Plea Agreement if these subsidiaries did not have important information to provide to the Government about their sales of IPC's in the United States.   Moreover, the same provisions subject the subsidiaries to criminal prosecution if they do not cooperate.

Further, Nippon Seiki's claim that Plaintiffs must limit their claims to the facts of its negotiated plea agreement is wrong.   The Amended Complaints sufficiently allege that Nippon Seiki and its subsidiaries participated in a conspiracy that extended beyond sales to only one automobile manufacturer and that the conspiracy covered more than two years.[4]   The allegations include Nippon Seiki's guilty plea, specific examples of Nippon Seiki's price-fixing and customer allocation activities over several years; Yazaki's plea agreement covering the period December 2002 until at least February 2010; a market structure conducive to price fixing; and widespread price fixing and market allocation throughout the automobile parts industry.   EP CAC ¶¶ 102, 112-117, 100-101, 86-92, 106-111; AD AC ¶¶ 156, 145-151, 152-155, 126-134, 159-165.   These allegations are also sufficient for the litigation to proceed against Nippon Seiki and its subsidiaries for the Class Periods alleged in the Amended Complaints.

### Summary of EP and AD Consolidated Class Action Complaints

The Amended Complaints identify all of the defendants, including Nippon Seiki, N.S. International and New Sabina as entities that manufacture, market and sell Instrument Panel Clusters (sometimes "IPCs") throughout the United States.   EP CAC ¶ 1, 4; AD AC ¶¶ 8, 10.

---

[4]   The Class Period in the EP CAC is December 2002 through at least February 2010.  EP CAC ¶ 3.  The Class Period in the AD AC is December 2002 to the present.  AD AC ¶ 2.

The Amended Complaints further allege that the defendants, including the Nippon Seiki Defendants "agreed, combined and conspired to inflate, fix, raise, maintain or artificially stabilize prices of IPCs and to allocate markets for IPC."  EP CAC ¶ 1; AD AC ¶1.

The Amended Complaints plead facts showing that the structure and characteristics of the Instrument Panel Clusters market render the conspiracy more plausible.  EP CAC ¶ 86; AD AC ¶ 126.   Specific allegations are made about the high barriers to entry and the inelasticity of demand.  EP CAC ¶¶ 87-89, 90-92; AD AC ¶¶ 127-132.

The Amended Complaints also explain that Nippon Seiki, directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold IPCs that were purchased throughout the United States during the Class Period.  EP CAC ¶ 7; AD AC ¶ 10.

N.S. International and New Sabina International are alleged to be wholly owned and/or controlled by parents Nippon Seiki.  EP CAC ¶¶ 71-72; AD AC ¶¶ 107-108.   And it is alleged that they manufactured, marketed and/or sold Instrument Panel Clusters in the United States.

Finally, the Amended Complaints describe the two Plea Agreements involving IPCs as well as the numerous other guilty pleas by other parties involving other automobile parts.

**The Nippon Seiki Plea Agreement**

On November 8, 2012, Nippon Seiki pleaded guilty to conspiring with other persons and entities engaged in the manufacture and sale of Instrument Panel Clusters, the primary purpose of which was to rig bids for and to fix, stabilize and maintain prices sold to an automobile manufacturer in the United States and elsewhere.   EP CAC ¶ 102; Plea Agreement ¶ 4(b). According to the Plea Agreement, the Instrument Panel Clusters that were the subject of the conspiracy were sold by a co-conspirator to an automobile manufacturer located in the Eastern

District of Michigan.  Plea Agreement ¶ 4(d).  The relevant period of the Plea Agreement is from at least as early as April 2008 until at least February 2010.  Plea Agreement ¶ 4(a); EP CAC ¶ 102; AD AC ¶ 156.

The Plea Agreement provides that "[t]he defendant and its subsidiaries will cooperate fully and truthfully with the United States" in the conduct of the case and its investigation of violations of federal antitrust and related criminal laws.  Plea Agreement ¶ 11.  The cooperation will include the production of documents by Nippon Seiki and its subsidiaries, obtaining cooperation of former directors, officers and employees of, among others, its subsidiaries.  Plea Agreement ¶ 11(a).  The Plea Agreement further provides that upon acceptance of the agreement, the United States will not bring further criminal charges against Nippon Seiki or any of its subsidiaries arising out of the conspiracy.  Plea Agreement ¶ 13.  Nippon Seiki further agreed that if the United States determined that it or its subsidiaries had failed to provide truthful and continuing cooperation, that the United States could elect to subject Nippon Seiki or its subsidiaries to criminal prosecution and that the United States would have the right, among other things, to prosecute both Nippon Seiki and its subsidiaries for the conspiracy set forth in the plea agreement.  Plea Agreement ¶ 19. [5]

### The Yazaki Plea Agreement

As alleged in the Amended Complaints, Yazaki Corporation also agreed to plead guilty for its fixing the prices of Instrument Panel Clusters.  EP CAC ¶¶ 100-101; AD AC ¶¶ 152-154.  Yazaki's plea period is from at least as early as December 2002 until at least February 2010.  EP CAC ¶ 100(b); AD AC ¶ 155.  Yazaki admitted that it conspired with other persons and entities engaged in the manufacture and sale of Instrument Panel Clusters sold to certain automobile

---

[5] Plaintiffs agree with defendants that for this motion the Court may review the Nippon Seiki Plea Agreement without converting the motion to dismiss into a motion for summary judgment.

manufacturers in the United States and elsewhere.  EP CAC ¶¶ 7, 100, 101-109; AD AC ¶¶ 8, 152, 154, 155, 165.

As described below, all of the foregoing factual allegations are considered in their totality and giving Plaintiffs the favorable inferences from those well-pleaded facts, the Amended Complaints sufficiently allege a plausible IPC price-fixing conspiracy in which defendants participated during the Class Periods

## II.  ARGUMENT

### A.  The Allegations Against N.S. International and New Sabina Satisfy *Twombly*'s Plausibility Requirements[6]

As set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), dismissal is only appropriate where plaintiffs fail to plead sufficient factual allegations to make their claim plausible on its face.  This does not mean that a heightened pleading requirement exists — rather the complaint need only allege sufficient facts to nudge the claim across the line from conceivable to plausible.  *Id.*; *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1002 (E.D. Mich. 2010).  "If the Court can discern some 'factual enhancement' pointing toward, or suggesting a basis for inferring, an illegal agreement, the motion to dismiss must be denied."  *Id.* at 1004 (quoting *Twombly*, 550 U.S. at 556-57).

Here, the parent corporation Nippon Seiki has pleaded guilty to price fixing and market allocation of Instrument Panel Clusters regarding a customer located in the United States.[7] Similarly, Yazaki has pleaded guilty to a conspiracy involving IPC customers in the U.S. and elsewhere.  Nippon Seiki's subsidiaries that sold Instrument Panel Clusters were the conduit for

---

[6]  Plaintiffs adopt and incorporate by reference the arguments advanced in: (1) Direct Purchaser Plaintiffs' Response in Opposition to Defendants' Collective Motion to Dismiss; and (2) End-Payor Plaintiffs and Auto-Dealer Plaintiffs' Memorandum of Law in Response to Defendants' Collective Motion to Dismiss.

[7]  The next section of this Memorandum further explains why the allegations in the Amended Complaints are sufficient against Nippon Seiki.

sales in the U.S.  EP CAC ¶¶ 71-72; AD AC ¶¶ 106-108.

It is a fair inference from the facts alleged that the two wholly-owned U.S. subsidiaries participated in the conspiracy because many of the collusive sales were made to U.S. automobile manufacturers.  Thus, at a minimum, the foregoing facts, taken as a whole,[8] lend plausibility to Plaintiffs' allegations that defendants N.S. International and New Sabina were participants in the unlawful conspiracy.  These allegations are sufficient to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.  This is particularly so, where, as here, the United States has demanded the cooperation of the subsidiaries in its further criminal investigation of the conspiracy in the United States and Nippon Seiki has agreed that the subsidiaries will provide such required cooperation.

The Sixth Circuit's recent decision in *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012), is instructive.  There, the Court held that "requiring [plaintiffs] to delineate in the complaint the role each subsidiary played in the conspiracy is unnecessary."  *Id*. at 446.  In *Carrier*, plaintiffs alleged that several defendant groups participated in an unlawful conspiracy to fix the prices of air conditioning and refrigeration copper tubes ("ACR Copper Tubes").  *Id*. at 436.  One of the defendant groups included Finnish based Outokumpu Oyj ("OTO"), its wholly owned Finnish subsidiary, Outokumpu Copper Products Oy ("OCP"), and OCP's two American subsidiaries Outokumpu U.S.A. and Outokumpu Franklin (together, "U.S. Subsidiaries").  *Id*. at 435.  Prior to the filing of the complaint, the European Commission ("EC") issued two decisions. The first decision found that OTO and OCP, among others, engaged in a conspiracy to fix prices for industrial tubes.  *Id.* at 435-36.  The second decision found that OTO and OCP, among

---

[8]   The complaint's allegations are not to be dismembered and must be read as a whole.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *see also Packaged Ice*, 723 F.Supp. 2d at 1017; *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 363, 373-74 (M.D. Pa. 2008).

others, engaged in a separate conspiracy with respect to plumbing tubing. *Id*. at 436. Notably, the EC's finding did not relate to the same product as that alleged in the civil complaint nor did it implicate the U.S. Subsidiaries or even suggest that the conspiracies extended beyond the European markets.[9] *Id.*

In moving to dismiss the complaint, OCP's U.S. Subsidiaries, like N.S. International and New Sabina here, argued that there were insufficient allegations in the complaint as to their "specific involvement" in the conspiracy. *Id.* at 445. Indeed, the court in *Carrier* characterized the U.S. Subsidiaries' arguments in a similar fashion to those made by N.S. International and New Sabina here: "The two U.S. entities' argument stems from [plaintiffs'] frequent use of the blanket references to the 'Outokumpu defendants,' without always specifying the role that each corporate entity played in the conspiracy." *Id.* Additionally, the U.S. Subsidiaries argued that neither of the EC decisions attributed any liability to them. *Id.*

The Sixth Circuit rejected those arguments and held that "[e]ven in the absence of direct allegations that Outokumpu's U.S. entities were co-conspirators . . . , the court may look beyond those entities' corporate forms if the complaint presents facts to support a determination that the subsidiaries were alter egos of the parent corporation." *Id.* For purposes of the motion to dismiss, the Court of Appeals found that the plaintiffs' allegations were sufficient where the complaint alleged that: (1) the U.S. Subsidiaries were responsible for selling the price-fixed tubing directly to plaintiffs; (2) the U.S. Subsidiaries sold the price-fixed tubing in the United States; and (3) the various Outokumpu entities were "operated and deliberately portrayed to the outside world as a 'single global enterprise' in which key executives overlapped." *Id.* at 445-46. Accordingly, the Sixth Circuit concluded that "[u]nder such circumstances, requiring [Plaintiffs]

---

[9]   Accordingly, the factual allegations giving rise to the plausible inference of a U.S. conspiracy were far weaker in *Carrier* than here, where Nippon Seiki has pleaded guilty to fixing prices of IPCs sold in the United States.

to delineate in the complaint the role each subsidiary played in the conspiracy is unnecessary, and [Plaintiffs'] allegations against Outokumpu's U.S. entities are sufficient to survive the motion to dismiss." *Id.* at 446.[10]

The factual allegations here are sufficiently analogous to those pleaded in *Carrier*, to require denial of defendants' motion. The Amended Complaints expressly plead that Nippon Seiki, directly or through "the ownership and/or control of its United States subsidiaries . . . engaged in an illegal price-fixing conspiracy." EP CAC ¶ 14(d); AD AC ¶ 16(d). The Amended Complaints further allege that Nippon Seiki "wholly owned and/or controlled these two subsidiaries and directly and through its subsidiaries manufactured, marketed and/or sold Instrument Panel Clusters that were purchased throughout the United States. EP CAC ¶ 71; AD AC ¶ 106. Most importantly, the Amended Complaints allege that N.S. International and New Sabina were wholly-owned and/or controlled by Nippon Seiki and at all times during the Class Period, N.S. International and New Sabina's "activities in the United States were under the control and direction of its Japanese parent." EP CAC ¶ 72; AD AC ¶¶ 107, 108. Thus, based upon these allegations of corporate unity and control by their parent, Nippon Seiki, it is not necessary for the Amended Complaint to delineate the role that the subsidiaries "played in the conspiracy" with any greater precision. *Carrier*, 673 F.3d at 446; *see also In re Elec. Carbon Prods. Antitrust Litig.* 333 F. Supp. 2d 303, 313 (D.N.J. 2004) (allegations that U.S. subsidiaries participated in conspiracy were sufficient where the complaint alleged that parent corporation

---

[10] Defendants' citation to *Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1 (6th Cir. 2003) is inapplicable here. Def. Mem. at 8. *Kenco* addressed whether a parent corporation could be held liable for breach of contract committed by its subsidiary and applied traditional corporate veil piercing principles in determining that the parent was not liable. 66 F. App'x at 4. *Carrier*, decided subsequent to *Kenco*, sets forth the standard in this Circuit for determining whether a plaintiff is required "to delineate in the complaint the role each subsidiary played in the conspiracy" and, as such, it clearly controls here. 673 F.3d at 446. Nor does *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119 (D.D.C. 2004), support defendants' position. Def. Mem. at 9. In *Jung*, there were no guilty pleas and no allegations that the U.S. subsidiaries were used by the controlling parent to sell price-fixed products. 300 F. Supp. 2d at 163.

had been fined by the EC relating to its participation in an international conspiracy).[11]

As such, the contention of N.S. International and New Sabina that Plaintiffs' allegations are insufficient is directly contrary to Sixth Circuit and other applicable precedent. Moreover, the cases cited by defendants in support of their argument are inapposite. For instance, in *In re Title Insurance Antitrust Cases*, 702 F. Supp. 2d 840, 878 (N.D. Ohio 2010), the plaintiffs' entire claim was dismissed with prejudice. Nevertheless, in a footnote, the court noted that the claims made against the corporate parents for the alleged acts of their subsidiaries should also be dismissed because "a corporate parent Defendant could not be liable under the Sherman Act merely for approving or assenting to the actions of its affiliate or subsidiary." *Id.* at 878 n.28. Defendants do not and cannot dispute that there is a material difference between corporate liability flowing upstream from a subsidiary to its parent and what is alleged here – corporate liability flowing downstream from a corporate parent that wholly owns and controls its United States subsidiary as the instrumentality through which it effectuated its unlawful conspiratorial actions in the United States. For the same reason, defendants' citation to *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963 (W.D. Tenn. 2004), is unavailing. There, the court dismissed a *pro se* complaint on a multitude of grounds. *Cupp*, 310 F. Supp. At 975. With respect to one defendant, the court noted that other than being the parent company of one of the defendants, it had no connection whatsoever to plaintiff's allegations. *Id.* at 972-73. Accordingly, under the circumstances, the "Court declined[d] to presume that a parent company participates in every decision or action of its subsidiary." *Id.* at 973.

Similarly, defendants' reliance on *RSM Prod. Corp. v. Petroleos De Venezuela Societa*

---

[11]    In the unlikely event that the Court deems that Nippon Seiki's control over these two subsidiaries has not been sufficiently alleged, Plaintiffs seek leave to file a motion to amend their complaints to plead additional allegations concerning the subsidiaries' participation in the conspiracy.

*Anonima*, 338 F. Supp. 2d 1208 (D. Colo. 2004), is misplaced.  Like in *Title Ins.*, the plaintiffs'

entire complaint in *RSM* was dismissed.  338 F. Supp. 2d at 1216.  With respect to the plaintiffs'

allegations as to defendant CITGO, the court noted that "[t]he plaintiff's only allegation

concerning CITGO is that CITGO is alleged to be the wholly owned U.S. marketing arm of

PDVSA . . . .  The fact that CITGO is a wholly-owned subsidiary of PDVSA, without more, does

not subject CITGO to liability on any basis."  *Id.*  As set forth above, far more has been pleaded

here than just the fact that N.S. International and New Sabina are Nippon Seiki's subsidiaries.

The Amended Complaints allege that N.S. International and New Sabina, as wholly-owned and

controlled subsidiaries of Nippon Seiki were used by Nippon Seiki to effectuate the illegal

conspiracy to fix prices and allocate customers and the supply of Instrument Panel Clusters in the

United States.  Nippon Seiki's plea provides further support.  Under the plea agreement, N.S.

International and New Sabina must themselves cooperate with the DOJ's criminal investigation

or face further liability.

Defendants' citations to *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue

Shield*, 552 F.3d 430 (6th Cir. 2008); *Michigan Division-Monument Builder v. Michigan

Cemetery Ass'n*, 458 F. Supp. 2d 474 (E.D. Mich. 2006); *Hinds County v. Wachovia Bank N.A.*,

620 F. Supp. 2d 499 (S.D.N.Y. 2009); and *In re Travel Agent Commission Antitrust Litigation*,

2007 WL 3171675, at *1 (N.D. Ohio Oct. 29, 2007) fare no better.  In *Total Benefits*, the

plaintiff failed to allege any facts indicating that there was a conspiratorial agreement among any

of the defendants.  552 F.3d at 436-37.  In *Michigan Monument* Builders, there were no

allegations that any defendant engaged in any wrongful conduct.  *See* 458 F. Supp. at 474.  The

case did not address facts alleged here that the subsidiaries were wholly owned and controlled by

the parent and were the conduits for the sale of prices-fixed products.  *Id.*  In *Hinds*, plaintiffs

alleged only that certain defendants sold products in the conspiratorially affected market, but failed to plead the defendants' connection to the conspiracy. 620 F. Supp. 2d at 512. And in *Travel Agent*, the plaintiffs did not even allege that the defendant, KLM, engaged in parallel conduct that comprised the alleged conspiratorial acts and, thus, on its face, KLM could not be tied to the conspiracy. 2007 WL 3171675, at *4. Here, in light of the numerous guilty pleas, including that of N.S. International and New Sabina's parent, Plaintiffs' allegations of a conspiratorial agreement are clearly plausible to say the least.

Also, defendants' reliance on *In re Refrigerant Compressors Antitrust Litigation,* 2012 WL 2114997, at *1 (E.D. Mich. June 11, 2012) is misplaced. In that case, the indirect purchasers failed to properly file an amended complaint and asked the court to cross-reference the direct purchasers' complaint that had more details about the conspiracy. 2012 WL 2114997, at *8-9. The court refused to cross-reference allegations in another complaint, but did take judicial notice of two guilty pleas of defendants and refused to dismiss those defendants. *Id.* at 8.

**B. Nippon Seiki's Plea Agreement Further Allows for the Reasonable Inference That the Subsidiaries Participated in the Conspiracy**

As set forth above, *Twombly* merely requires that the fair inferences from the well-pleaded facts plausibly suggest a claim for relief. The plea agreement entered into between the United States and Nippon Seiki provides an independent basis, apart from the allegations of the Amended Complaints, upon which such reasonable inferences can be drawn. In its plea, Nippon Seiki admitted to participating in a conspiracy to fix prices of IPCs to a U.S. customer. Notably, the plea agreement also expressly provides that N.S. International and New Sabina, as subsidiaries of Nippon Seiki, are required to provide cooperation to the United States in its further prosecution of this criminal conspiracy and that, if N.S. International and New Sabina fail to provide such cooperation, the United States can elect to prosecute N.S. International and New

Sabina for price fixing Instrument Panel Clusters in violation of the Sherman Act.   Plea Agreement ¶ 19; EP CAC ¶ 9; AD AC ¶¶ 11, 157.   Thus, at the pleading stage, it is a reasonable inference that N.S. International and New Sabina have knowledge of and information concerning the conspiracy that will be shared with the Government.   Such knowledge, coupled with the fact that the entities through which Nippon Seiki sold the price-fixed Instrument Panel Clusters in the United States, would allow for a reasonable inference at the pleading stage that N.S. International and New Sabina participated in the conspiracy.

## C.   The Claims Against Nippon Seiki More Than Satisfy *Twombly*

Nippon Seiki's assertion that Plaintiffs must limit their claims against it to the facts of its negotiated plea agreement with the Department of Justice is incorrect.   Nippon Seiki admits that there was an Instrument Panels Cluster conspiracy that it joined, but insists that the other well-pleaded facts of the Amended Complaints should be ignored.   Rule 12(b)(6) is not the appropriate procedural device to ask a court to decide the scope of a conspiracy that has otherwise been adequately alleged.   *In re Refrigerants Compressors Antitrust Litig.*, 795 F. Supp. 2d 647, 660 (E.D. Mich. 2011).   Defendant's argument also runs afoul of the principle that a civil suit should not be "circumscribed or defined by the boundaries of the criminal investigations or plea agreements."   *Packaged Ice*, 723 F. Supp. 2d at 1011.   The DOJ often agrees to allow criminal defendants to plead guilty to more limited charges. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002), *cert. denied*,  537 U.S. 1188 (2005) (setting forth reasons why the DOJ's decision to limit criminal charges and to not prosecute ADM for fixing prices of high fructose corn syrup, when it had prosecuted ADM for participating in two other price-fixing cartels, had no evidentiary value in the civil case; one reason was that the private bar would pursue the case with vigor); *In re Polypropylene Carpet*

*Antitrust Litig.*, 178 F.R.D. 603, 620 (N.D. Ga. 1997) (stating that "the Court is aware of no authority that requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment.  To the contrary, several cases flatly reject this theory.");  *In re Static Random Access Memory ("SRAM")*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2005) (guilty pleas in SRAM industry supported "inference of a conspiracy in the SRAM industry.");  *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ("Finally, the Court rejects the notion that the guilty pleas and cooperation agreements and the class settlements foreclose a broader conspiracy.  Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention.");  *Id.* at *11 n.13 ("the government may undertake plea bargains in order to achieve certain strategic objectives and these goals may be different from those of private litigants"); *In re Flat Glass Antitrust Litig. (II)*, 2009 WL 331361, at *13 (W.D. Pa. Feb. 11, 2009) at *3 (observing that the fact that one of the defendants was not a participant in a European conspiracy referred to in the complaint did not provide a basis for dismissal in light of the other allegations plausibly suggesting that the defendant was part of a U.S. conspiracy); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3443405, at *1 (E.D.N.Y. Aug. 21, 2009) (existence of numerous guilty pleas on specific routes suggestive enough to render plaintiffs' global conspiracy allegations plausible);  *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143, 2012 (WL 1366718, at *2 (N.D. Cal. Apr. 19, 2012) (guilty pleas are relevant to the plausibility of plaintiffs' conspiracy claims).

Nippon Seiki also asks the Court to ignore the allegations that Yazaki also agreed to plead guilty to the same conspiracy covering multiple auto manufacturers during the period at least as early as December 2002 to at least February 2010.  In *In re Refrigerants Compressors Antitrust*

13

*Litig.*, 795 F. Supp. 2d 647, 660 (E.D. Mich. 2011) defendants challenged the time period of an alleged conspiracy that was not co-extensive with their respective plea agreements. The court refused, recognizing that *Twombly* did not contemplate dismembering the complaint to match individual plea agreements.

Even if Nippon Seiki had conspired during only some of the conspiracy period that fact would not diminish its liability. It is well established that a party that joins a conspiracy becomes liable for all acts committed by its co-conspirators, including acts done before it joined the conspiracy and acts done after it stopped actively participating in the conspiracy. *See U.S. v. Gravier*, 706 F.2d 174, 177-78 (6th Cir. 1983) ("It has long been established that a conspirator may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined."); *U.S. v. Hayter Oil  Co., Inc.*, 51 F.3d 1265, 1271 (6th Cir. 1995) ("withdrawal is an affirmative defense which must be proven by the defendant . . . . Absent proof that any conspirator has withdrawn from the conspiracy, he is liable for all acts performed in furtherance of the conspiracy by the other conspirators.").

Additionally, the Amended Complaints allege that the market structure and characteristics of the Instrument Panel Clusters market make the conspiracy more plausible. EP CAC ¶¶ 86-92; AD AC ¶ 126.  Several cases have found allegations of market structure probative under *Twombly*. *See, e.g.*, *Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d, 538, 575-76 (M.D. Pa. 2009).

The Amended Complaints also provide concrete examples of how Denso, Yazaki and Nippon Seiki coordinated their bids. EP CAC ¶¶ 112-177; AD AC ¶¶ 145-151. Nippon Seiki gives no weight to the allegations that show how the conspiracy operated and inaccurately asserts that the Amended Complaints fail to show any wrongful conduct before or after its negotiated

plea period.  Nippon Seiki knows well that the bidding process and the actual production and

sale of Instrument Panel Clusters covers many years.  Thus, bid-rigging that occurred in a given

year would result in sales at collusively set prices several years later.  EP CAC ¶ 116 (Request

for Quotation issued in 2009 for 2013 model year car).

Indeed, at the criminal plea hearing, Nippon Seiki's counsel admitted that the commerce

affected by the conspiracy occurs later in time than the actual bidding process:

> THE COURT:        And that the commerce affected by that conspiracy would
> have occurred much later because of the timing of the bid process, as it were,
> which is substantially in advance of sales that ultimately occurred to be
> appropriate as the only way to reflect the actual commerce that was affected by
> the conspiracy in this case, which I understand the government used at 3.3 million
> –
>
> MR. MEIRING:   Yes.
>
> THE COURT:        -- in volume and defense agrees with that.
>
> MR. VICTOR [Nippon Seiki's Counsel]:  Yes, your Honor.

Nippon Seiki Guilty Plea and Sentencing Hearing Tr. 22, Nov. 8, 2012, Exh. "A" attached

hereto.

It is the actual sale of Instrument Panel Clusters that caused damage to Plaintiffs, not the

bid-rigging and price-fixing alone.  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (each

sale to plaintiff at prices fixed pursuant to an ongoing conspiracy is an "overt act" that is part of

the violation.); *Morton's Mkt. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) (an

antitrust violation occurs each time a customer purchases the product at an artificially inflated

price).  Thus, the allegations showing examples of how the bidding process actually worked do

plausibly allege that the wrongful conduct by Nippon Seiki and its conspirators extended before

2008 and after 2010.  And again, the other allegations of the Amended Complaints, including the

Yazaki plea, plausibly show that the conspiracy was greater in scope than Nippon Seiki suggests.

Finally, the Amended Complaints do not base their allegations on a grand jury investigation. Instead, there are allegations of: admitted price fixing of IPCs in connection with Plea Agreements, how the conspiracy was carried out, market structure; corporations obtaining DOJ amnesty and widespread industry investigations.   Therefore, Defendants' reliance on *In re Graphics Processing United Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) and *Hinds Cnty.v. Wachovia Bank, N.A.* 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009), that held that a complaint that principally relies on a government investigation does not allege enough under *Twombly* are inapposite.

### III.    CONCLUSION

For the foregoing reasons, defendants' motion should be denied in all respects.

Dated:  May 28, 2013                    **COTCHETT, PITRE & McCARTHY, L.L.P.**

By   /s/ Frank C. Damrell
Joseph W. Cotchett
Frank C. Damrell
Steven N. Williams
Adam J. Japala
Gene W. Kim
**COTCHETT, PITRE & McCARTHY, L.L.P.**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
fdamrell@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
gkim@cpmlegal.com

**ROBINS KAPLAN MILLER & CIRESI L.L.P.**

**By**   /s/ Hollis Salzman
Hollis Salzman
Bernard Persky

16

William V. Reiss
**ROBINS KAPLAN MLLER & CIRESI L.L.P.**
601  Lexington Avenue, Suite 3400
New York, NY  10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@rkmc.com
bpersky@rkmc.com
wreiss@rkmc.com


**SUSMAN GODFREY L.L.P.**


By   /s/ Marc M. Seltzer
Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, Ca  90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com


Terrell W. Oxford
Warren G. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas  75202
Telephone: (214) 754-1900
Facsimile: (214) 754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com


**THE MILLER LAW FIRM, P.C.**


By   /s/ E. Powell Miller
E.  Powell Miller (P39487)
Adam T. Schnatz (72049)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com


*Interim Liaison Counsel for End-Payor Plaintiffs*

17

**MANTESE HONIGMAN ROSSMAN AND WILLIAMSON, P.C.**

By   /s/ Gerard V. Mantese
Gerard V. Mantese (Michigan Bar No. P34424)
David Hansma (Michigan Bar No. P71056)
Brendan Frey (Michigan Bar No. P70893)
Joshua Lushnat (Michigan Bar No. P75319)
**MANTESE HONIGMAN ROSSMAN AND WILLIAMSON, P.C.**
1361 E. Big Beaver Road
Troy, Michigan  48083
Telephone: (248) 457-9200 ext. 203
Facsimile: (248) 457-9201
gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com
jlushnat@manteselaw.com

**BARRETT LAW GROUP, P.C.**

By   /s/ Don Barrett
Don Barrett
David McMullan
Brian Herrington
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS  39095
Telephone:  (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

**CUNEO GILBERT & LADUCA, L.L.P.**

By   /s/  Jonathan W. Cuneo
Victoria Romanenko
**CUNEO GILBERT & LADUCA, L.L.P.**
507 C Street, N.E.
Washington, DC  20002
Telephone:  (202) 789-3960
Facsimile: (202) 789-1813
jonc@cuneolaw.com

Vicky@cuneolaw.com

Joel Davidow
Daniel Cohen
**CUNEO GILBERT & LADUCA, L.L.P.**
8120 Woodmont Ave., Suite 810
Bethesda, MD  20814
Telephone: (202) 789-3960

Michael J. Flannery
**CUNEO GILBERT & LADUCA, L.L.P.**
300 North Tucker Blvd., Suite 801
St. Louis, MO  63101
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
mflannery@cuneolaw.com


**LARSON • KING, L.L.P.**

By   /s/  Shawn M. Raiter
Shawn M. Raiter
Paul A. Sand
**LARSON • KING, L.L.P.**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

*Attorneys for Automobile Dealer Plaintiffs*

19